## Case No. 2,369.

CAMPBELL et al. v. TEXAS & N. O. R. CO. et al.

[2 Woods, 263.][1]

Circuit Court, E. D. Texas. May Term, 1872.

RAILROAD MORTGAGES — RIGHTS OF CERTIFICATE HOLDERS—PRIORITY—CONSTITUTIONAL LAW—INVASION OF VESTED RIGHT — IMPAIRING OBLIGATION OF CONTRACT.

1. A railroad company executed a first mortgage on its line of road to secure a large number of its bonds. The mortgage contained a clause declaring that whenever the company should procure from the state a loan of six thousand dollars per mile out of the school fund, to which it would be by law entitled to the performance of certain conditions, and which it was the declared intention of the company to obtain, and should execute to the state its bonds therefor, said bonds should constitute a lien upon the property mortgaged, superior to the lien of said first mortgage. Forty miles of the road remained to be completed, for which

no loan from the state had been received. The legislature then passed an act authorizing the company to make a mortgage to secure bonds to the amount of $6,000 per mile upon this uncompleted portion of its road, which should be prior to the said first mortgage, provided the company would relinquish all claims to the state loan for that portion of its road. This mortgage was executed accordingly, and the bonds secured thereby, sold. *Held:*

(a) That by relinquishing the right to the state loan, the company did not preclude itself, with the assent of the legislature, from putting the new mortgage upon the road, which should be superior to the original first mortgage.

[See Galveston, H. & H. R. Co. v. Cowdrey, 11 Wall. (78 U. S.) 459.]

(b) The act of the legislature authorizing this proceeding on the part of the railroad company did not invade any substantial and vested rights, and was therefore valid and binding.

2. The bonds to be given the state for the loan of the school fund were to run ten years, and a sinking fund was to be provided for their payment; the bonds which were authorized in their stead were to run fifteen years, and no sinking fund was required to be set apart for their payment. *Held,* that these circumstances were not of the essence of the contract, and that the legislation authorizing these changes did not impair the obligation of the contract contained in the original first mortgage.

3. The bonds to be given for the state loan were to bear six per cent. interest; the bonds authorized in their stead, bore eight per cent. interest. *Held,* that the addition of two per cent. to the interest of the substituted bonds was to that extent an invasion of the rights of the holders of bonds under the original first mortgage, who had the right to claim that bonds at the rate of $6,000 per mile only, and bearing only six per cent. interest, should be made superior to theirs.

4. A party holding a first incumbrance on property about to be brought to sale, ought not to be deprived of the right of bidding on the property up to the amount of his claim. Therefore, when his right of priority is in dispute, it ought to be settled before the sale; and whenever a specific property, on which a separate incumbrance exists, can be sold separately without injury to or sacrifice of that or other property, it should be thus sold so as to give every incumbrancer the chance of protecting his securities without involving himself in onerous engagements.

5. A trust deed, executed by a railroad company to secure its bonds, purported to convey a large number of sections of public lands, being a portion of what the company would be entitled to on the completion of its road; the certificates for which were receivable from time to time as portions of the road were completed: *Held,* that purchasers in good faith from the railroad company of a part of the certificates, without notice that they were covered by said deed of trust, acquired a good title free from the incumbrance of the trust deed.

[In equity. Bill by Calvin C. Campbell and another against the Texas & New Orleans Railroad Company and others, for foreclosure of a mortgage. This cause was heard for final decree on the pleadings and evidence. It had been before one of the judges of the court (Mr. Circuit Justice Bradley) on a former occasion upon a motion to dissolve an injunction which had been allowed in the case; which motion involved the merits of the bill. The opinion of the circuit justice

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

upon that motion contains a full statement of the facts, and will be found in 1 Woods, 368 [Case No. 2,366], to which the learned reader is referred.

Geo. W. Paschal and John Sessions, for complainants.

Wm. M. Evarts and Wm. P. Ballinger, for defendants.

BRADLEY, Circuit Justice. Without rehearsing the facts of this case, which was done in a previous opinion, I will proceed to state the conclusions to which I have come.

1. On the main point involved in the case, the claim of priority on behalf of the bonds issued in 1861, my opinion is that the said bonds and the mortgage given to secure the same are entitled to priority over the bonds of 1858, commonly called the land grant bonds, upon the property covered thereby, namely: the railroad, road bed, turnouts and depots, between Houston and Trinity river, together with the locomotive engines and rolling stock, etc., appertaining thereto.

It seems clear from the evidence, that at the commencement of the year 1861, that portion of the road, at least, remained still unfinished, and that the resources of the company were exhausted; that the school fund loan for this portion of the line, on which the company had relied, was essential to enable it to complete the work; and that the state could not or did not desire to advance any more school fund bonds. In this situation of affairs, on the 7th day of February, 1861, the act was passed, entitled "An act for the relief of the Texas & New Orleans Railroad Company," by the first section of which it was enacted, that the company should have until the 1st of January, 1863, to locate its land certificates, and return the field notes of the same to the general land office; and by the second section, that the company should have the power, and was thereby authorized, to issue a first mortgage upon its railroad from the west bank of the Trinity river to the city of Houston: provided, that the company should relinquish all claims to the state loan on that section of its road. Now; the mortgage of 1858 had in it a special reservation, that whenever the company should procure from the state the loan referred to, being $6,000 per mile to be loaned from the school fund (which it declared its intention to obtain), and should execute its bonds to the state for the repayment thereof, they should constitute a lien upon the property mortgaged prior and superior to the said mortgage of 1858. This reservation was made in pursuance of the law of 1856, which entitled the company to this school fund loan, and by which it was expressly provided, that the bonds given to the state therefor should constitute a lien upon the road and charter rights of the company, including the road bed, right of way, grading, etc., and all property owned by the company as necessary for its business; and that they should

have a priority over all other claims against said company. Pasch. Dig. arts. 3501–3505.

Now, what relief could it have been to the company to destroy this right to raise money by putting a first lien of $6,000 per mile on their road? The holders of the bonds of 1858 contend, that although the company might have given such a lien to the state upon borrowing money of it, yet that it relinquished this right, and by relinquishing it, made their bonds and mortgage the first lien on the road and its appurtenances. This certainly could never have been the intention of the parties, for it would have been, on the part of the company, a piece of the greatest fatuity thus to surrender this most valuable resource for raising the means which were necessary to enable it to complete its road and works. And to my mind, it is proved quite conclusively, as far as parol proof and the contemporary acts of the company and all dealing with it at that time, can go to prove a matter of this kind, that the act of February 7, 1861, was regarded and intended as a permission and authority, given by the state to the company, to substitute some other lender in its place, and to subrogate its right of priority to such substituted creditor. The question is, could this be done?

There seems to be no doubt, that the state might have advanced the loan, received the company's bonds, and assigned such bonds to any other party, and might thus have substituted another party in its stead. The state might have proposed to A. thus: "Advance this loan to the Texas & New Orleans Railroad Company for us, and you shall have the company's bonds to be received therefor." No reasonable objection to such a transaction could have been made by prior mortgagees or bondholders. If either of these things could be done, why could not the state, in the exercise of its legislative power, have substituted another party in its place as lender, and authorized a subrogation of all its rights of priority to such lender? No substantial rights of any other persons or parties would have been thereby invaded. And acts of state legislation are to be sustained, if they do not invade any substantial and vested rights. If the legislature of the state, by the act of 1861, did this, I can see no objection to the validity of the transaction. The company, upon the footing of this law, formally relinquished its claims to the state loan as required, and provided for the issue of 480 bonds of $500 each (being just $6,000 per mile for the forty miles of railroad yet to be constructed), and amounting in all to $240,000, payable in fifteen years, with interest at eight per cent. per annum, and to secure the same, executed to Benj. A. Shepherd and William J. Hutchins, as trustees, a mortgage on the said forty miles of road, its turnouts, depots, etc., and the locomotive engines and rolling stock, etc., appertaining thereto. These bonds and the mortgage were dated the first of January

and issued the 18th of March, 1861. The bonds expressly stated, that this issue of bonds and the mortgage was made in lieu of the issue of the same amount on the said section of railroad which the company was authorized to issue and deliver to the state under the act of August 13, 1856 [Laws Tex. 1855–56, p. 31]; and the mortgage, in like manner, refers to the act of 1861, and formally relinquishes all claims to the state loan, and professes to be a first mortgage on this part of the road by virtue of that act. The bonds thus executed were issued to various parties, contractors and others, and the proof is sufficiently conclusive that they were received for value to the amount of their face, and were negotiated and received as a first lien on that portion of the railroad. In my judgment, these parties are entitled to stand in the place and stead of the state, and have a first lien on the line in question, according to the terms of the act of 1856, and the reservation contained in the mortgage of 1858. I believe it to have been the intent of the parties, the intent of the legislature, and the understanding of the holders of the bonds of 1858 themselves, as evinced by their declarations and conduct.

2. But it is objected by the defendants, that the bonds which were given vary from those which were to be given to the state; and hence they cannot, even by legislative aid, be substituted therefor without impairing the obligation of the contract between the company and the bondholders of 1858, as, first, they run for a longer time—fifteen years, instead of ten years. I do not regard this as belonging to the essence of the contract. The term of ten years is mentioned in the act of 1856 as the time for the bonds to run, it is true, this period being directory to the state officers, as to the time they were to allow the bonds to run. But there was no specific mention of the time of credit in the reservation made in the mortgage of 1858; and the substantial circumstance as between the company and the holders of the bonds of 1858 was, that the former had a right to lay a loan of $6,000 per mile on their road, to have priority of the mortgage securing the bonds of the latter.

Another variance relied on is the fact that the bonds and mortgage of 1861 do not require a sinking fund to be reserved, as was to be done with the bonds to be given to the state. This, again, does not belong to the substance of the right as between these parties. It was one of the terms in detail which the officers of the state were to require of the company. It was a mode of payment, or rather a mode of providing for payment, which came to the same thing in the end, as payment of the entire amount at the day of maturity. If that sinking fund were annually put up, just so much would be abstracted from the funds of the company which might otherwise have gone into improvements, making the property of the company so much more valuable. It would make the company neither richer nor poorer. If the substitution could be made at all, the legislative power to authorize it to be done could not be made to depend on a strict and literal compliance with all the terms which the state officers were required to observe in taking the company's bonds. Had the arrangement with the state itself been carried out, surely, the legislature could have authorized the school fund board to receive bonds at fifteen years, instead of ten years, without losing the state's priority of lien. The great, controlling, substantial stipulation between the company and the bondholders of 1858 was this: "We expect to make a loan from the state of $6,000 per mile on our road, at six per cent. interest; that loan must be a first lien." All the rest is matter of detail between the state and the company, of no essential concern to the bondholders. This strikes me as the sound and sensible view of the subject.

A third variance complained of is the promise to pay eight per cent., instead of six per cent., on the bonds of 1861, six per cent. being the amount to be paid to the state. I regard the additional two per cent. per annum as an additional burden imposed on the road, beyond what was stipulated for. The company had no right to interpose ahead of the bonds of 1858, anything more than $6,000 per mile, drawing six per cent. interest. As this is matter of amount merely, it ought to affect the holders of the bonds of 1861 only pro tanto. If the bonds issued and outstanding are the full quota of $6,000 per mile, only six per cent. can be allowed thereon. This is the limit of incumbrance which should be placed in priority to the bonds of 1858. If less than $6,000 per mile have been issued, then such abatement must be made of the eight per cent. interest, if any abatement is necessary, as will bring the amount to $6,000 per mile and six per cent. interest.

3. But the defendants insist that the original decree is substantially correct, in any event, and ought not to be modified, inasmuch as "the relative priority of the two series of bonds" is left open for future decision, after the sale shall be made. It seems to me, however, to be very material to a party holding a first incumbrance on property, not to be deprived of the right of bidding that property up to the amount of his claim. This he cannot do when the property is sold together with other property, or when his right to priority is left in dispute. Cases often occur when a sale of the property out and out, and a subsequent adjustment of claims upon the fund, is the only just method which can be pursued. But whenever a specific property on which a separate incumbrance exists can be sold separately, without injury or sacrifice of that or other property, it ought to be thus sold, so as to secure to every incumbrancer, if practicable, the right of protecting his security without involving himself in onerous engagements, or being

subjected to onerous conditions. And if a decree is made in plain disregard of this rule, I think it ought to be corrected.

A decree in this case will, therefore, be made for correcting the decree complained of, by which it shall be declared that the said bonds and mortgage of 1861 are entitled to priority over the bonds of 1868, and by which the forty miles of road and its appurtenances, between the Trinity river and the city of Houston, as embraced in the mortgage of 1861, shall be sold separately for the purpose of paying, first, the proportionate amount due to the receiver for expenses on the said road yet unpaid, and also a proportionate amount of the costs and expenses of suit; and secondly, the amount of principal and interest due on the bonds of 1861, not to exceed what the full amount of $6,000 per mile would amount to at six per cent. per annum.

Another matter of complaint made against the decree in the former suit is, that it directs the special master to sell "all the land warrants or scrip received by said company from the state of Texas;" whereas, only 1320 sections of said land were included in the two trusts deeds of 1858, and none of them were included in the mortgage of that date. And on the other hand, the complainant Campbell alleges that he is the holder of one hundred and eighty land certificates of 640 acres each, amounting to 115,200 acres in all, which he holds as surviving partner of Morris, Campbell & Co., who were the contractors for building said road, and received from the company in all four hundred and seventy-two certificates, or 302,080 acres of such land scrip; and received the same in good faith, without any knowledge of their being mortgaged or pledged in any manner, and have parted with all except those now held, to other persons, purchasers thereof in like good faith; and he claims to be protected in the possession and enjoyment of these certificates, and that the other parties to whom certificates were sold by Morris, Campbell & Co. may also be protected. The counsel for the holders of the bonds of 1858, on the other hand, contend that the trust deeds which cover these land grants to the extent of 1320 sections (then not in existence, it is true) became a lien on the first 1320 sections which were subsequently issued by the company, as soon as they were issued; and if there is any difficulty in finding the balance, the contractors must meet it; hence they demand that the contractors shall surrender all the certificates held by them, or at all events, that they shall be subject to sale under the decree, until the number of 1320 sections has been made good to the use of the trust deeds of 1858.

It is admitted on both sides that when the trust deeds were given, these land grants were not yet earned by the company; that they existed only in contemplation of law, and depended for actual existence upon compliance by the company with the conditions which, by the laws of Texas, would entitle it to certificates therefor; that when the certificates did issue, until actually located, they were mere personal property, and like any negotiable security, transferable from hand to hand. It also appears that the amount to which the company would be entitled, when the conditions were complied with, was sixteen sections per mile of their road; that they included in the two trust deeds only twelve sections per mile (which amounted to the 1320 sections), and reserved four sections per mile (which was 440 sections in all) to be employed by them in constructing their road, in common with the proceeds which they might derive from the sale of their bonds. This arrangement seems apparent from the evidence and all the acts of the company taken together, and it is unnecessary for me to refer to particular parts of it. It is the conclusion to which I have come from the facts and evidence in the case. Then how do the respective claimants stand in relation to each other? The bondholders, as against the company, under the deeds of trust, have a claim to certificates for 1320 sections of land; not by absolute grant or assignment, but by the effect of the trust deeds operating by way of estoppel. The trust deeds could not operate as grants of these certificates, for the certificates were not in existence when the deeds were executed. They only operate by way of estoppel. They amount to covenants on the part of the company that the certificates shall be included in the trust deeds when they come into existence. This is the doctrine of equity. To this the courts hold the company, and as against it and its assigns, having notice of the contract, they treat the certificates as if they had been in existence, and had been embraced in the trust deeds when they were executed. But the courts will not override other equities in coming to this result. If parties purchased the certificates in good faith, and without notice of any such estoppel, it would be doing injustice to them to deprive them of the certificates so purchased.

In the case before us, there was a margin of four sections per mile, over and above the amount or number of sections pledged to the bondholders, which the company itself had a perfect right to dispose of. It would be naturally supposed by parties dealing with the company, even if they knew of the existence of the trust deeds, that so long as the company kept within the line of this margin in issuing additional certificates, no interference was made with those to which the trustees under the trust deeds were entitled. If a man sell me fifty bushels from a lot of one hundred bushels of corn, and a third person afterwards, with knowledge of the sale to me, purchase the remainder, and remove his part of the lot, leaving my quantity undisturbed, how can he be liable to me, even though the seller should afterwards

fraudulently dispose of my part to other parties?

From the evidence in the case, and all the facts and circumstances bearing upon this part of it, without attempting to go into unnecessary details, I am brought to the conclusion that the contractors received their certificates in good faith, and are entitled to be protected in the possession and enjoyment thereof; and the decree should be modified accordingly.